Good afternoon. This is the time set for argument in Walden v. Shinn, and we'll hear first from the appellant. Thank you. Good afternoon, Your Honors. My name is Stanley Molliver. I'm with the Federal Public Defender's Office, and I represent the petitioner and the appellant, Mr. Robert Walden. With the court's permission, I'll watch the time and try to reserve a few minutes for rebuttal, and I'd like to discuss today Issue 4, which implicates the Martinez and amendment questions. In 2014, this court remanded five ineffective assistance of counsel claims for the district court to reconsider them in light of Martinez. The district court found that those five claims were untimely and didn't reach the Martinez issue. Because equitable tolling is appropriate under these circumstances, the district court's timeliness ruling is erroneous. We would ask that the case be remanded again so that the district court can consider those five claims in light of Martinez. The state has raised two objections to our equitable tolling argument. The first is a waiver assertion, and the second is an attempt to distinguish our case from Williams v. Filson. So I'd like to address each of those two objections in order. There are three well-settled exceptions to this court's waiver jurisprudence that permit the court to reach the equitable tolling argument here. The first is that there has been intervening law that justifies reaching the equitable tolling argument. At the time of the district court proceedings and at the time Mr. Walden filed the brief, Williams v. Filson hadn't been decided. And so the extraordinary circumstances prong of our equitable tolling argument was not yet available. Now, contrary to the state's objection, it is of no moment that our argument was presented clearly in a supplemental brief rather than in a reply after Williams v. Filson was decided. Because of the court's intervening law cases, what matters is not whether the issue that was not raised in an opening brief is raised in a replacement brief or a supplement or a reply or a 28-J, but is it raised in a sufficient way that the state or the opposing party, I should say, has an opportunity to respond, and here they did. Nor is it of any moment in our view that Mr. Walden could have in theory raised the same argument Mr. Williams did to extend the law that existed previously in the way that this court endorsed in Williams v. Filson. There are at least two reasons for that. In this court's intervening law exception cases, if you will, there's no general requirement that the change in the law or the intervening law be unanticipated or unforeseeable. Further, in the case on which Williams relied, Harris v. Carter, the court drew, or I should say described as the critical fact that there was controlling, binding circuit precedent on the issue on which the appellant relied. So it would have been reasonable from a habeas practitioner's position not to see the extension from Harris v. Carter to Williams as inevitable. Counsel, what do you think you get out of Williams? What does Williams give you? The extraordinary circumstances. The extraordinary circumstances are what? That Mr. Walden, like Mr. Williams, relied on the interpretation of the relation-backed doctrine in Rule 15 that predated the U.S. Supreme Court decision in Mayo v. Filson. Right. It was unsettled law. That's correct, Your Honor. Okay. What difference does that make? Well, if Mr. Walden relied on unsettled law at the time his statute of limitations expired and then his otherwise timely claims became untimely when the U.S. Supreme Court decided Mayo v. Felix. Counsel, you have to make judgments all the time. You're pushing us to extend things all the time. There are unsettled questions that we address every day. That doesn't excuse people from doing things. As I read Williams, the problem in Williams was that there was an established procedure set out by the district court in that case that said you're going to conduct discovery and at this point you're going to amend. And that district court order was sort of the law of the district. And that's what he relied on. It wasn't that the law was unsettled. It was the law actually was settled. It was just settled contrary to a way that the Supreme Court would decide it later on. But it was settled by the district court in a district court procedure. Now, how is your case like that? Well, respectfully, Your Honor, I think in Harris v. Carter, which predated Williams, this court rejected that sort of any requirement that the district court affirmatively mislead or lull a petitioner into filing an untimely petition. In Williams, the court began, not with the district court's order in its analysis, but on what a reasonable petitioner could perceive the law to be in light of what it was outside the habeas context, interpreting the relation back doctrine. Can I ask a question about that? It's related to what Judge Five was asking. So Williams put a lot of emphasis on the state of the law at the end of 1998 and said it gave counsel no reason to suspect that Rule 15C posed an obstacle to considering newly added claims. But by the time the claims were withdrawn from Mr. Walden's first habeas petition in October of 2000, there were four circuits that had weighed in and said that Rule 15C would be construed more narrowly. How does that affect your argument? It doesn't for two reasons. The first is that in Williams, again, I think the primacy was on what the law of this circuit was, not what the law of other circuits was. That's not correct, is it? The case makes a big point of saying there was only one case in another circuit in 1999, so it came too late. It clearly is looking at the law across the board and treatises and everything else. I certainly think the state of the law outside of the Ninth Circuit was relevant, just not dispositive, Your Honor. And to the extent it is relevant, again, I think a reasonable petitioner in Mr. Walden's position could believe that those cases outside of the Ninth Circuit were distinguishable in a meaningful way. For example, the Eighth Circuit decision, I believe, in Craycroft, which was the first of those cases to come out, did not involve claims that had been previously withdrawn. So there wasn't the same sort of—I should say there was more of a notice problem to the defendants in Craycroft than there is here. That distinction between the Ninth Circuit's view of relation back and the Craycroft view was, in fact, the distinction that this court drew in Anthony v. Cambra in 2000. So if there were any—so it would have been reasonable to distinguish those cases, and if, as those cases began to arise, a reasonable petitioner harbored any doubt about his interpretation of relation back, those doubts would have been put to rest as soon as the court decided Anthony v. Cambra. I also think that it's notable that in Williams, the statute of limitations in that case expired, and the petitioner brought his—excuse me, I should say the petitioner brought his claims back to amend, I think, something like six or seven months after Craycroft was decided. There wasn't any indication in the Williams decision that Mr. Williams was responsible for coming back into the district court once Craycroft was decided to clarify the state of the relation back law. Again, while I agree and appreciate that cases from outside of the circuit were relevant, I don't believe that they're dispositive for those reasons. Is it sort of problematic that Williams gave two reasons for extraordinary circumstances? One was there was no reason to suspect that Rule 15c would be construed more thoroughly, and reason two was would Judge Bybee raise that the district court and the state shared the same misapprehension, and that neither of those reasons seemed to be present in this case? Respectfully, Your Honor, I disagree. At the time that the statute of limitations ran, notwithstanding the development of distinguishable law coming from out of circuit on relation back in this circuit, it was still reasonable to believe that the interpretation of Rule 15 that the court ultimately accepted in Felix was reasonable. To Your Honor's point and Judge Bybee's point about the corroboration from the other actors in the case, notwithstanding that there was no affirmative misrepresentation from the district court, the actions of those other parties nonetheless corroborate the reasonableness of Mr. Walden's view. The state didn't object on timeliness grounds, and the district court didn't assert any untimeliness in denying the motion to amend. Well, that's because the rule based on procedural bar didn't really have to reach that issue, right? It said it was procedurally barred, and that's what the state argued, and the district court agreed it didn't have to make an alternative holding about no equitable tolling. That's fair, Your Honor, but the fact that the state didn't raise it at all, I think, suggests that it wasn't unreasonable for Mr. Walden to have the same view of the relation back doctrine that Mr. Williams did, notwithstanding that Mr. Walden would have made that judgment just after within a few months or a year of when Mr. Williams made it. I'd like to return to the, unless there are further questions on this particular issue, I'd like to also address the diligence prong of the extraordinary circumstances, because I think the state has suggested something of a red herring that, notwithstanding Mr. Walden's diligence, that any equitable tolling period wouldn't get him back far enough to the statute of limitations to make a difference here. But I think that misconceives Williams, excuse me. In Williams, the equitable tolling period ran all the way back to when the statute of limitations applied. So irrespective of whether the claims were withdrawn here a few days before or after the statute of limitations expired, either way, there would be tolling for the whole period. On the other end of the equitable tolling period, extraordinary circumstances period, the state has suggested that there's three months after the Arizona successive post-conviction proceedings expired in which Mr. Walden wasn't diligent. But there isn't anything in the record to suggest that there was a lack of diligence. And to the contrary, the pleadings in the district court reflect that once the state court proceedings concluded, Mr. Walden made an effort to obtain a record on appeal from the Peeba County Superior Court and the Arizona Supreme Court. And only after determining that those records wouldn't be forthcoming or not forthcoming soon enough, did he go back into the district court and move to a bend. I should also add that during that period, the sentencing related claims were stayed in the district, excuse me, in the district court. So when that stay was lifted and the entire case was right or active, I should say, Mr. Walden went back within, I think, 13 or 14 days. So I think that looking at just that 90-day period might be slightly misleading. I'd like to flag for the court two other well-established exceptions to the waiver doctrine to ensure that the equitable tolling argument is assessed on its merits. In addition to the existence of intervening law, the court will set aside any waiver when there's no prejudice, excuse me, to the opposing party. And here, the state did not oppose our motion to file a supplemental brief on equitable tolling, had the opportunity to address it, and did address it. And finally, the court will set aside any waiver based on manifest injustice. I think there are several bases to conclude that applying a finding of waiver to the equitable tolling argument on these facts would be manifestly unjust. Primarily, or I should say first, in at least one other case that I'm familiar with, the court has permitted the state to raise an affirmative defense of untimeliness for the first time on appeal. So it would be unjust to then not permit a habeas petitioner to raise equitable tolling for the first time on appeal to combat that finding of untimeliness. Additionally, here, the state, as I mentioned before, did not raise untimeliness as a defense in 2004, I believe, when Mr. Walden first moved to amend, nor did they raise untimeliness as a defense when Mr. Walden filed a motion in the Ninth Circuit to remand so that the district court could reconsider the claims in light of Martinez. And finally, I think the merits of the IAC claims themselves warrant setting aside any waiver. Among those claims is a challenge to trial counsel's ineffective performance at the sentencing where, despite Mr. Walden coming to the court convicted of multiple sexual assaults and a sexually motivated homicide, there was no meaningful evidence before the sentencer to contextualize Mr. Walden's conduct or mitigate his culpability. Most troublingly, there was no evidence of the pervasive sexual misconduct and incest across multiple generations of Mr. Walden's family, or evidence that Mr. Walden's own childhood was marked by sexual abuse and incestuous relationships, including with his father. So the sentencer didn't have a record of the trauma or an explanation of how that trauma set the stage for Mr. Walden's own inability to regulate his sexual impulses as an adult. What do you think, for mitigation, the PCR courts thought that the new information you provided was mainly just cumulative and that all that information hadn't acted in front of the state court before. What do you think is the key piece of information that was not presented at sentencing that would have a reasonable probability of a different result? There were no declarations, for example, from family members describing the extent or magnitude of the pervasive incest in this family over multiple generations. So there was the one declaration by, I think it was an aunt, saying about how her brothers and various relatives were involved in incest. I don't know that it related specifically to Mr. Walden, did it? The testimony at trial, I think, was limited to an incestuous relationship between the aunt and Mr. Walden's brother. I understand that Mr. Walden continues to say that he had not been abused by his father. And also, of course, at sentencing he was trying to prevent the information about his father's sexual criminal history from being made public. Do you have any declarations from him or anything that would change that information? I don't believe there's a declaration from Mr. Walden in the record. But what we do have in the record are the expert reports, for example, from Dr. Lewis that reflect that when any constitutionally adequate investigation was undertaken, that information came out. So I appreciate that that information was limited at the 1992 sentencing. But I think that has to be viewed in the context of a trial counsel who did not even begin a mitigation investigation prior to, excuse me, until after Mr. Walden was convicted. I believe his trial counsel went out and interviewed witnesses for the first time within a month, perhaps two, of when the first sentencing or mitigation hearing was scheduled. So if the records that have been developed since then demonstrate, in our view, what all kinds of mitigation, meaningful mitigation, would have come out had counsel not performed deficiently. If you were given a clean slate right now at the guilt phase, I'm sorry, at the sentencing phase, so what evidence would you put on? Would you let out the Lewis report? Would you have Dr. Lewis testify? Yes, Your Honor. Does she get cross-examined about the other two murders that your client confessed to? Yes, Your Honor. She would be subject to cross-examination. But I don't think that makes a difference in light of the type of mitigation we're talking about and also the fact that the trial judge was… What would be your theory of mitigation and how would that be different from the one that was put out in 1992? Our theory would be that the pervasive sexual abuse to which Mr. Walden was exposed and the trauma and experiences he had linking sex and violence at a young age diminished his own abilities to regulate his sexual impulses and contributed to the sexual violence for which he was convicted. We would bolster that with the other mitigation evidence included in Dr. Lewis's report and also in Dr. Goldberg's report related to his mental illness, which never came out, related to his cognitive… You're talking about bipolar disorder? That's right. Bipolar disorder was described by Dr. Lewis, I believe also by Dr. Goldberg. Dr. Goldberg described cognitive dysfunction and that all of these mitigating circumstances combined together, as articulated by a well-qualified expert, not by me, would demonstrate the link between the mitigating circumstances of his childhood and his subsequent actions. The reason I ask is because I've read the public defender's handwritten notes. I've read all the notes that she put together. One of the things that was most telling for me was at the end where she listed, I think it was eight different items and then numbered them, which page I'm talking about. She numbered them from one to eight in the order in which she would present them. And she began with the bad things in the childhood. It's interesting that numbers two through eight are all good things, that he was an honor student, that he had been a Boy Scout, that he had played baseball and football, that he was a father and a husband, that he had been in the military. And the story that counsel tells there is things were lousy at home and he overcomes those things. This is a man well worth saving because he can be redeemed. The story that you tell is a different story. I'm not sure that it's a more effective story. You've told the story in a different way, which is the guy never had a chance. He was so messed up from the beginning. You're not going to put the stuff in about the Cub Scouts or the Boy Scouts or the Honor Roll or the football. Why is your theory a better theory than what counsel came up with in 1992? Because ours is the product of a constitutionally adequate mitigation investigation. The investigation that leading up to the 1992 sentencing was superficial. It was brief. It was belated. It was not thorough enough to uncover important records that could have been used to corroborate, as you said, the number one thing on that list about the traumatic childhood. And so it they couldn't have made a reasoned, informed determination at the time to put on the sort of good guy theory that your honor is describing because they hadn't done the adequate investigation to support it. I would also be remiss if she had quite a bit. She had quite a bit of evidence. She knew about a lot of the sexual misconduct. She knew about the aunt. She couldn't relate it to her client, but she knew about it. They had the father's criminal history. They knew that there was a lot of really bad stuff that had to be going on because the family had really covered that up. But your client didn't want that out, and they fought to keep it out. So counsel had lots of bad information, which your client didn't want out at the time. And so now we're supposed to second guess that we're supposed to that client. That discomfort with the father's records coming out could have been fairly a product of how rushed that whole episode was. Trial counsel hadn't gone out, obtained those criminal history records, discussed them with the client, discussed them with an expert, relied on an expert to explain to the client the importance. I mean, those records were turned over on December 1st, I believe, and then put before the court on December 9th for the first time at the sentencing hearing. So I don't think that the client's initial discomfort when this first comes out is an indication of what a reasonable client or a reasonable counsel would do. And I'm still quite surprised, counsel, that you would think that you've got a better argument today than you did in 1992 if you put a doctor on the stand who's going to be asked, did your client confess to any other crimes, and he said yes, he killed two other people that he's never been charged with. And that's a better defense than was brought in 1992? Yes, Your Honor, including because the sentencing judge was aware that Mr. Walden had been charged with another murder, was aware of another recent sentence, I believe, also for sexual assault. And the mitigation that we're talking about here is the kind of, I mean, you know, for lack of a better expression, it mitigates the man. It's not a voluntary intoxication offense where the mitigation is specific to a particular crime. This is evidence that would have contextualized Mr. Walden's sexual misconduct at, you know, irrespective of the potential for the judge to learn that he had other bad acts. I also think it's important to note that at this stage, this is, we're just at the Martinez stage. So we haven't had an evidentiary hearing on the underlying ineffective assistance of counsel claims. But at this stage, we're only trying to demonstrate that the underlying claim of ineffective assistance of trial counsel without evidentiary development or a hearing is substantial enough to justify a second look under Martinez. I don't think there's any dispute that state post-conviction counsel was ineffective. And so as we talk about the ineffective assistance of counsel claim, we certainly believe it's compelling. We think that Mr. Walden's entitled to relief as a result. But at this stage, it's just about whether the claim is sufficiently substantial that the district court ought to take a second look in light of Martinez. Is that the correct analysis? I thought for the PCR counsel, we can't find that she is constitutionally ineffective unless there was a strong ineffective assistance of sentencing counsel claim. Because otherwise, for raising that claim wouldn't raise a reasonable probability that the outcome of the PCR hearing would have been different. So I think under Clayboard or Decision Clayboard, there has to be a strong Strickland claim of the trial counsel sentencing counsel were deficient. Respectfully, Your Honor, not a strong claim, just a substantial claim. Well, that's for the prejudice prong, but for in order to find the PCR counsel to be constitutionally ineffective. It can only be so if the trial counsel claim, ineffective assistance of trial counsel claim, would have made a difference at the PCR hearing. And that would only happen if she could have made a strong showing of deficiency and prejudice, it seems to me. I think that's what Claiborne says. I disagree that that's what Claiborne said, and I would commend to the court the more recent decision of Ramirez versus Ryan, which I think reflects that when there is an underlying substantial claim of trial counsel. That is, you know, it doesn't get you all the way there. It doesn't get you all the way to finding that post conviction counsel was ineffective. But it's a pretty good indicator that if there's a substantial underlying claim that post conviction counsel's failure to raise it was ineffective. Your Honor, reserve. I will. Thank you, Your Honor. We'll hear from the state. Thank you. May it please the court. My name is Lacey Gard. I represent David Shin and this appeal. I'd like to start out just by responding to a couple of the comments that Mr. We're looking at this for the first time on appeal. And the other the other plan, the waiver I wanted to respond to as well is that, you know, I do agree we had an opportunity to brief it on appeal. That's fine. But the issue is really just the lack of development of the I'm sorry, I apologize. I lost my train of thought. So I'll just move on to the to the Williams issue. Well, on the on the waiver issue. Yeah. First points. Sorry. You're basically arguing that the district court didn't have the opportunity to develop it. So why isn't a remand appropriate? Well, for just on the. Yeah, it's just an equitable time. Well, because I think I mean, I think we can. That's a good question. I think we because and I don't have a good answer. I'm sorry. Why remand wouldn't be appropriate, but to have the district court address that in the first instance, there's some benefit to that. But I think if we want to just look at the factors, diligence and extraordinary circumstances, we can look at that and say, and we may, we don't need to worry about exactly when the period started and stopped. Because unlike in the Williams case, we have as we have a situation here where this defendant, his attorneys were warned, specifically warned to include everything in the petition that anything that's not included in the petition would be considered waived. So that's kind of the opposite situation as what was at stake in Williams, which is where the defendant was told, you can file your petition later. You know, I'm going to set a deadline that's way outside of the limitations period and go ahead and file it can consist or on that deadline. And then when that deadline came and he filed the petition, it was dismissed as untimely. So it was a kind of a bait and switch situation. We don't have that here. What we have here is the district court telling the defendant include everything in the petition. And then you will recall from the record that there was a dispute once the petition was finally filed. And I think it was August of 2000. There was a dispute between the district court and Mr. Walden's counsel about whether Mr. Walden had to identify claims that were not presented in state court, whether he had to file a statement of exhaustion. And he didn't want to have to do that because he was going to have to admit that claims were not raised. And it was only after this court denied his mandamus petition that he withdrew those claims rather than admit that he had not raised them in state court. So really what we have here is not an extraordinary circumstance that's preventing equitable or preventing timely filing. In fact, we have the claims filed timely. So we know that there was no extraordinary circumstance that prevented anything. What we have is a strategic decision by Mr. Walden's attorneys to remove claims from the petition and take their chances in state court. Let me ask you two questions about that and about whether it was a reasonable decision to withdraw the claims and whether that showed reasonable diligence. Was there, and Walden makes the argument, was there a reasonable possibility that a state court would have reached the merits so that it would have been exhausted on the merits? I see that the state and Mr. Walden are disputing that issue. Right, and I guess I'll start with Mr. Walden filed a 28-J letter citing some authority, citing Smith v. Stewart from this court, finding that the procedural default rules were not independent and adequate. And to the extent that may have been an unsettled issue at the time, you know, Smith v. Stewart sort of suggests that maybe it was. But at best, it was an unsettled issue. And so that leaves two paths that counsel can take. And I believe this was alluded to in the questioning of Mr. Molliver. You can make the argument, leave the claims in the petition, make the argument that they should be heard or withdraw them, which is what they did and take their chances in state court. As a matter of Arizona law, was there a reasonable possibility that the state court would have reached the merits and not just said as it did that they were procedurally defaulted? No, I don't think there's a reasonable possibility of that. There may be, you know, an outside chance of that. But and the best evidence of that, you know, could be that the APAL case, for example, and I don't recall the year of his Rule 32, but I know that they went back to state court and filed some claims in a successive Rule 32 and effective assistance claims that were found to be procedurally defaulted. And I think also just as a whole, the Martinez jurisprudence in this district, in the District of Arizona, the cases that have been remanded from this court to the district court, almost all those cases, except for this one. The only two I'm aware of, at least, are this case and the Gonzalez case, which I cited on the notice of related cases. In every other case, the inmate left the claims in the petition and accepted that they were procedurally defaulted. I don't I don't recall. There may have been cases where someone argued that there were still state court remedies left. But I don't think that that was a common argument being made at the time. And I and I'm just I'm not aware of any significant support for the idea that there were still state court remedies left. And the other thing about Stewart versus Smith is that that was decided two years after the claims are withdrawn in this case. So they weren't withdrawn in reliance on that case or anything else. And again, you know, if there was an argument to be made that the claims could still be heard, then fine. There's an argument to be made that they could, but there's also a very strong argument, I would say, a stronger argument to be made that they that they couldn't. And again, it comes down to a strategic decision by habeas counsel. That's the basis for the claims being untimely, is because they made a strategic decision to withdraw them from the petition. So I think the argument is, had they not withdrawn them and had the district court determined that they were unexhausted, the whole the entire petition would have been dismissed. Because expectations were not allowed at that time. Is that incorrect? Expectations were not allowed. So if they were unexhausted, but but I think they they if anything, they pulled the pulled the claims prematurely because there was no. The implication of the briefing that I that I'm taking is that they were backed into a corner. Mr. Walden felt backed into a corner that he had to remove the claims or else the petition would have been dismissed. But there was no threat of imminent dismissal because the state hadn't asserted exhaustion as a defense at that point. And the district court hadn't found the claims to be exhausted, exhausted. And my understanding of the procedure before Ryan's versus Weber is that if there was a mixed petition, the petitioner prior to dismissal should be given an opportunity to cure that by withdrawing the unexhausted claims. So exhaustion was still something out there to be litigated. And, you know, again, which it was bringing me back to my point that that I think, you know, they made a call as to how the best way was to proceed with their case. And they did it despite being warned by the district court that that that their claims might not be able to be brought back in that initial scheduling order. And I'd also like to point out that that two years later, after the ineffective assistance claims were withdrawn from the petition, there was an issue with with ring. Ring came out and there was a Sixth Amendment claim in the petition that was affected by ring. And the in that particular instance, and I think the district court noted this in its most recent order or maybe in the 2004 order that Mr. Walden did go to the court and, you know, tell the court he wanted to exhaust these claims in state court and got a stay of the sentencing claims. Now, I realize that doesn't affect the statute of limitations, but it does show that if there was some kind of confusion as to how to proceed with the claim that he knew how to approach the district court and ask for a stay. So and I guess all of this is relevant in my mind when we're talking about equitable tolling or any kind of equitable remedy that just that basically deals with fairness. Right. That we want to make sure that everyone's being treated fairly. And in this particular situation, we have counsel making decisions that are clearly strategic. And in fact, I think there's a finding in the in the 2004 district court order that this the claims have been withdrawn as part of a tactical decision to circumvent the court's rules. So in light of that whole constellation, you know, they made a call. They have to take the consequences of that call, which is that the claims are untimely when they try to amend them back in. And on the issue of diligence as well, Mr. was over when he withdrew the claims. I realize that there's an argument out there that there was an earlier date potentially starting the tolling with the Arizona Supreme Court order being signed 12 days before it was filed. And and only if we go from that earlier date do those three months matter. But those three months, the explanation that Mr. gave this morning or this afternoon for diligence during those three months was that they were waiting for records from the post conviction proceeding. And the records that were necessary to support the claim were records in his position possession. They were his affidavits. They were the same evidence by and large, almost entirely the same evidence that was later presented with the Martinez motion. So that evidence was available to to counsel at the time. And also the claims had been briefed by that point a couple of times, once in the in the petition prior to the withdrawal. And then again, on the on the rule 32. So so all of these things together. Basis, in our view, at least for finding a total. And I guess this brings me back to Judge Thomas. Your question, why this isn't a good why we shouldn't remand to the equitable or to the district court for finding of equitable tolling. And I think that's the answer is because if we're going to break down the time limits, it just it doesn't matter. It doesn't matter what was going on in those three three months because we he withdrew the claims before or after the statute of limitations had already expired or best case scenario. He hasn't given a good enough explanation as to what was going on during those three months. That that warrants a finding of active actively pursuing his claims for relief. First, the the argument that under Martinez, assuming that we we think the claims are properly before us. And the question is whether the procedural bar is excused by the PCR councils and effective assistance. Can you address whether there was a ineffective assistance of sentencing council claim based on the mitigation in front evidence and investigation? Yes, of course, absolutely. So I agree that under Claiborne that there has to be a showing of post conviction councils and effectiveness and that that includes that subsumes a trial and effectiveness claim. Because if post conviction council omits a claim that is not is is not meritorious, then there's no ineffective assistance in this particular instance. And and I I laid out in the brief I cited Penholster and I think I probably cited Sully versus errors as well. It seems to me that the well, two things. First of all, just backing up. The first thing is that the council is sentencing. Mr. I disagree with Mr. Oliver's characterization that they basically did nothing and they waited too long to start interviews. And we know the reason why they waited, at least with the expert assessment, which was to prevent the state from getting a heads up as to who their expert was and what they were looking at. So but notwithstanding them waiting, they were able to get multiple continuances from the trial court. There are references in the packet of notes that that the court mentioned that they went. They traveled to different parts of the country to interview friends, family members of Mr. Walden. They were aware of the allegations against the father. And that actually calls into question one of the other ineffective assistance claims, which is faulting council for not objecting based on a late disclosure of, I think, a police report or something relating to the father. But the reality is they knew they knew all of the or they knew they knew there were allegations against the father and they knew about the father's arrest. And there's notes from, I think, I believe, May of 1992. It was. I'm not sure about the date, but where there's a reference to comments from the defendant notes taken during a jail visit where the defendant tells his attorney to check with his father about releasing the information and then describes having been contacted when he was in the Air Force and learning about what his father had done. So council was aware of that information. But the problem that council had is they had an inmate who or a client who was, by all accounts, whatever the reason for it was a very dangerous person, someone like Penholster, who was they ran the risk of having the jury think that this person was beyond rehabilitation. And I think that Dr. Lewis's report in particular confirms that. And not only that, but also the statements in the again in council's notes, we don't we don't have a report in there from Dr. But we do have the phone messages that I'm sure that the court has seen in the packet of notes where Dr. Profile from Mr. Walden is the most dangerous profile and how he's an honest psychopath and how, you know, just very things that are very, very damaging. And I and, you know, could there be an argument that maybe if he had known about this, this, this the father's background, maybe that would have changed. That's an issue for the expert. But the but the bottom line is that the attorney, having been given all of this information, has to make a judgment as to whether it's it's whether it's a good idea to continue down this path of expert testimony and to try to, you know, find find an expert to say something. But it doesn't know why you start. One of the reasons you start your mitigation investigation well before trial of a capital case. I mean, it affects your strategy going forward on the on the on the guilt phase as well as the penalty phase. And the attorney did nothing really on mitigation until after the trial, which is if the judge had denied the continuances, he would and he would have presented anything true. Well, I believe. Well, yes, I don't know here that there was any effect on the guilt phase strategy because the strategy of the defense. No, we don't know. But I mean, that's the whole point. It can affect it may not. But, you know, you can't go into a capital trial without having prepared for all aspects. Wouldn't you agree? I said, well, I mean, I suppose that's best practice. Yes. I mean, it would be best practice to start as as early as you can. But we don't demand, I guess, perfection from from attorneys, constitutionally adequate representation. And and, you know, maybe if the continuances had been denied, the mitigation presentation wouldn't have been as thorough. But the continuances were granted. And and in this particular case, they did have time to consult with an expert. And that's one reason that the court kept pushing sentencing out was to allow them to continue with this expert assessment and to continue to consult with the expert to see if they were going to use the report. And in fact, there was another expert as well. That was that was contacted, which was Dr. Becker, who was specifically chosen because of Mr. Walden's background. So and on that point, too, there are statements in the record where counsel says that they suspect that Mr. Walden was abused specifically by his father. And but they weren't going to be able to establish that from him and that he did not want that report out for public consumption. So that's another factor that goes into counsel's decision making process. So so I think both on the issue of deficient performance and on the issue of prejudice, I think you have to consider the fact that the mitigation here available, including the mitigation presented for habeas. Dr. Lewis's report, to a lesser extent, Dr. Goldberg's report. And then also, you know, just the nature of these crimes, that the mitigation is profoundly double edged in this case, that a reasonable attorney can make the decision that they don't want to present expert testimony because it will be more harmful than helpful. And especially a report like that. You know, you can you can argue strategic choice, but you have to make a strategic choice based on a full investigation. Correct. Well, it has to be an informed choice. Right. It has to be an informed choice. I do agree with that. But I think that there was enough here make an informed choice in light between the family interviews that were conducted, the the expert opinions and evaluation that was done. I don't think this is one of those those types of cases where, you know, counsel just did nothing and just sat on their heels for, you know, forever. And then, you know, maybe called the defendant's mother to testify about what a good person he was or something. This is this is counsel did do some legwork to uncover, to uncover a good bit of information and attempt to develop expert testimony that didn't pan out or was not used for presumably strategic reasons, which are which are fairly obvious to me, at least from the then been disclosed by Mr. I asked opposing counsel what he thought was the most important new information. And he indicated that it was I think he was referring to the declaration of the act about the extensiveness or pervasive of the sexual misbehavior in the family. That was number one. And number two was the diagnosis of mental impairment by Dr. Lewis. So what's your assessment of how that compares with what the attorneys had uncovered originally? Well, certainly the there is there was less information. There was no information specifically presented about Mr. Walden being sexually abused that I recall. There was the, you know, the inference that the aunt had sexually abused him because she sexually abused the brother. But and there wasn't that I recall information other than the reports that were submitted regarding the father. But the intergenerational background was certainly not presented at sentencing. And of course, there was no mental health evidence presented either. But my response to Mr. Malver thinking that those are two or having the opinion, I didn't mean that derisively. I'm sorry. Having the opinion that those were the most the most important pieces of mitigation, taking them separately, the background information, unless someone can show that, you know, Mr. Walden was. And again, we have no statements from Mr. Walden's mouth himself, at least relating to his father. He may have he may have said that his aunt did something. But but aside from what may have directly happened to Mr. Walden himself, the intergenerational background is part of the picture. But I don't think it's it's significantly weighty. And I don't think a jury there's a reasonable probability that or a sentencer would find it to be reasonably weighty. And that's the same is true for the abuse that he himself experienced, because it is remote in time to the crime. And I think the court asked Mr. Malver about Mr. Walden's accomplishments and his ability to kind of be an OK person, at least superficially growing up. And that would seem to also counsel against a finding that this significantly affected his behavior. Now, as for Dr. Lewis's bipolar disorder diagnosis, she, as I recall, opined that the the condition is characterized with impulsiveness and aggressiveness and things of that nature. Even that in light of the facts of of the murder for which he was being sentenced to death and also just the pattern that we know that he engaged in from the survivors, it's not consistent so much with an explosive or impulsive act of rage. It's more consistent with a predatory kind of stalking behavior where he, you know, he fooled, for example, the one into allowing her into his his his her home. He did it through a ruse that he was a maintenance man. It seems likely he did. He may have done the same thing with the homicide victim because the witness saw him, you know, again with with the the pest control equipment at the apartment complex. So there seems to be significant planning in these offenses. So so so that for that reason, I think it's minimally weighty, but it's also double edged because if a sentencer was to accept that theory that Mr. Walden just is uncontrollable, that he has these rages, that he can't control himself, that he's, you know, prone to these moments of just pure aggression, you know, the bipolar disorder may explain that. But that doesn't mean that a sentencer is not going to look at that and say, well, this is a reason not to show leniency because this is a person who is just too dangerous and who can't be fixed and who has just done too much harm to society, whatever the reason. So which brings me back to, I guess, my point that, you know, an attorney and counsel had some of that information about him being, you know, the most dangerous MMPI profile and the statement from Dr. Esplanade about him being an honest psychopath. Those kinds of things all go into counsel's equation. And so in light of them having that knowledge, I don't think that we can I would submit that that they can't be deemed ineffective for instead attempting to focus on, you know, some of the, I guess, better qualities of him, like that he was able to, you know, have athletic accomplishments and trying to show that, you know, there was some family, some family dysfunction that makes him more of a human, you know, that humanizes him to some extent. I don't have anything else to discuss beyond the briefs unless the court has additional questions for me, I'm glad to answer them. Just a couple. Sure. First, do you agree with the district court that the Arizona Supreme Court applied a causal nexus test? I don't agree with the district court, but I do admit, I will admit to you that it is that the citation to Wallace is problematic in light of the court's jurisprudence. You know, I made a request to reconsider McKinney. I know that I mean, I mainly made that to to preserve it because it's an en banc opinion and we're bound by it. I do agree with the district court that it would have been harmless error. Yes. So basically, the district court, I gather you really are in your heart agreeing with the district court that the Arizona Supreme Court applied a causal nexus test. Right. I don't. I mean, first of all, the district court first says citation to Wallace is is problematic. And then he quotes them saying that petitioner did not explain how self-esteem and alcoholism had anything to do with the rapes and murders and which would seem to be a causal nexus. The court. Also, the reason I don't fully agree that there was a causal nexus test is that the court, the Arizona Supreme Court, started its discussion of mitigation with the locket rule and recognize the obligation to consider all all mitigation. But but I do acknowledge that I do it. No, I do not think the district court's finding of a causal nexus was unreasonable. I don't agree with it. I would stand on my. I don't have anything better than what I've put in the brief as to why that wasn't possible. Is it procedurally barred? I mean, the Arizona Supreme Court said it was waived and I didn't see anything in Walden's brief arguing that there was cause and prejudice that would excuse that procedural default. Right. Yes. And that's a kind of a threshold question. In fact, the district court didn't allow the petition to be amended to include the McKinney claim because because it had not been briefed in the habeas petition. I don't recall to be candid if the district court found a procedural default as well. I believe that it's we started one at some point, either in district court or in our brief. But the district court, as the alternative said, even if it is, if it relates back to, I think it was claimed 31 in the petition, which we maintain it doesn't. I'm not and I don't want anything I'm saying here to answering the questions about causal nexus to be construed as a waiver of those those arguments, because I think they were correct. But but the district court said that even assuming there was a causal nexus, that it was it was harmless and abrupt. Any further questions? All right, counsel. Thank you for your argument. Thank you. Thank you, Your Honor. Just a few brief points. Judge Acuda asked a question about whether it was reasonably possible or whether it was reasonable to proceed in 2000 that the claims were unexhausted and that there was a reason to withdraw them and take them back to state court. I think the best evidence of that is in the state's opposition to Mr. Walden's motion to amend Mr. Walden sought amendment on the grounds that he had these newly exhausted claims. The state did not argue that the claims had always been technically exhausted and that Mr. Walden was just wasting time in state court. Instead, the state characterized the successive post-conviction proceedings as, quote, the proceeding in which he exhausted the 22 additional claims he now seeks to add. Ms. Gard also suggested that because Mr. Walden acted strategically in view of the legal landscape he faced, that there's something incompatible with equitable tolling. And the court squarely rejected that argument in Harris versus Carter and in Harris and in Williams and in other cases of its ilk, Neds versus Calderon, for example. The petitioner is always making determinations based on the law as he perceives it to be, and there is nothing incompatible about doing so with a finding of equitable tolling. Ms. Gard made a note about the comments from Dr. Esplin back in 1992, I believe, suggesting that Mr. Walden was so dangerous that mitigation wouldn't, I suppose, wouldn't have been valuable. Dr. Esplin, this is at ER 950, expressly said that his records were incomplete. He wasn't given any sort of information from the trial lawyers that would have allowed him to reach a useful or informed decision. Now, it may be that in some circumstances, trial counsel provides an expert with the material that the expert needs. The expert provides an opinion that trial counsel recently concludes is unhelpful and decides not to use that expert. But that's not what happened here. I think, Your Honor, Judge Thomas, Chief Judge Thomas, excuse me, is correct that or pardon me, I shouldn't presume. We think that the facts are undisputed as to the equitable tolling and sufficient to grant equitable tolling. But if there is any further factual development that's needed on that issue that we would support and request a remand to the district court. I see that I'm out of time. Thank you, counsel. Thank you both for your presentations today. The case just argued will be submitted for decision. And we realize time did not permit you to get to all of the issues in the case. But we have your briefs and have read them and considered them. So we understand you used your time efficiently today. And thank you for that. We will be in adjournment. Thank you, Your Honors. Thank you. This court for this session stands adjourned.
judges: Thomas, Bybee, Ikuta